# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WONDERLAND NURSERYGOODS CO., LTD., | ) ) | Civil Action |
| | ) | No. 2:13-cv-00387 |
| Plaintiff, | ) ) | |
| | ) | Judge Mark R. Hornak |
| v. | ) ) | |
| THORLEY INDUSTRIES LLC (*d/b/a* 4MOMS), | ) ) | ***Electronically Filed*** |
| | ) | ***[REDACTED VERSION]*** |
| Defendant. | ) | |

## DEFENDANT THORLEY INDUSTRIES LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MR. MICHAEL CHASE

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL FRAMEWORK ....................................................................................... 2

III.  OVERVIEW OF MR. CHASE'S DAMAGES OPINIONS ........................................... 2

   A.   Mr. Chase's Initial Report ..................................................................... 3

   B.   Mr. Chase's Supplemental Report ........................................................... 5

IV.   MR. CHASE'S DAMAGE THEORIES MUST BE EXCLUDED ................................... 7

   A.   Mr. Chase Cannot Apply a
        Hypothetical Negotiation Date Other than January 15, 2013 .................... 7

   B.   Mr. Chase's Use of Two Hypothetical Negotiation Dates Is Contrary to Law ....... 10

   C.   Mr. Chase's Use of the "Total Cost Impact" Is
        Not a Reliable Method for Determining a Reasonable Royalty .............................. 12

      1.   Mr. Chase Does Not Provide a Reliable Basis to Assume the
           "Total Cost Impact" Constitutes a Reasonable Royalty for the Life of the Patent .... 12

      2.   Mr. Chase Fails to Separate Damages Between
           the Patented and Unpatented Features ........................................................ 12

      3.   There is No Basis to Shift the Entire "Total Cost Impact" to Thorley ...................... 15

V.    CONCLUSION ................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*3D Sys., Inc. v. Aarotech Labs., Inc.*,
　160 F.3d 1373 (Fed. Cir.1998) ............................................................................... 10

*Applied Medical Resources Corp. v. U.S. Surgical Corp.*,
　435 F.3d 1356 (Fed. Cir. 2006) .............................................................................. 10

*BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*,
　1 F.3d 1214 (Fed. Cir. 1993) ................................................................................ 3, 8

*Daubert v. Merrell Dow Pharm., Inc.*,
　509 U.S. 579 (1993) ................................................................................................. 2

*General Electric Co. v. Joiner*,
　522 U.S. 136 (1997) ................................................................................................. 2

*Giese v. Pierce Chem. Co.*,
　43 F. Supp. 2d 98 (D. Mass. 1999) ....................................................................... 8, 9

*I-Flow Corp. v. Apex Med. Techs., Inc.*, No. 07-cv-1200,
　2010 WL 144405 (S.D. Cal. Jan. 12, 2010) ............................................................ 9

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
　331 F.3d 860 (Fed. Cir. 2003) ................................................................................. 7

*LaserDynamics, Inc. v. Quanta Computers, Inc.*,
　694 F.3d 51 (Fed. Cir. 2012) ......................................................................... passim

*Lucent Techs., Inc. v. Gateway, Inc.*,
　580 F.3d 1301 (Fed. Cir. 2009) ............................................................................. 11

*Micro Chem., Inc. v. Lextron, Inc.*,
　317 F.3d 1387 (Fed. Cir. 2003) ............................................................................... 2

*Nordock Inc. v. Systems Inc.*, No. 11-c-118,
　2013 WL 989864 (E.D. Wis. March 13, 2013) ...................................................... 15

*Paoli R.R Yard PCB Litig.*,
　35 F.3d 717 (3d Cir. 1994) ...................................................................................... 2

*StemCells Inc. v. Neuralstem Inc.*, No. AW-06-1877,
　2009 WL 3681653 (D. Md. Oct. 30, 2009) ............................................................. 8

*Versata Software, Inc. v. SAP Am., Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013)................................................................... 13

*Virnetx, Inc. v. Cisco Systems, Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)............................................................. 13, 14

*Wang Labs., Inc. v. Toshiba Corp.*,
    993 F.2d 858 (Fed. Cir. 1993).................................................................... 9

**STATUTES**

35 U.S.C. § 252........................................................................................... 8

35 U.S.C. § 271(a) ................................................................................... 7, 8

35 U.S.C. § 271(e) ....................................................................................... 8

35 U.S.C. § 271(e)(1)................................................................................... 8

**RULES**

Fed. R. Evid. 702 ........................................................................................ 2

Defendant Thorley Industries LLC (d/b/a 4moms) ("Thorley") respectfully requests that the Court exclude the opinions and testimony of Mr. Michael Chase, Plaintiff Wonderland Nurserygoods Co., Ltd. ("Wonderland")'s damages expert, on the ground that his opinions are not the subject of reliable principles and methods or reasonably tied to the facts of the case.

## I.      INTRODUCTION

Wonderland has retained Mr. Michael Chase as its expert on damages.  In forming his opinions, Mr. Chase accepts many of Thorley's positions, including that Thorley had a large inventory protected by intervening rights at the time the patent issued, that the patented feature has no impact on the market appeal of the accused product, and that the accused product could be easily modified to remove the patented feature for very little cost.  Yet, despite accepting these positions, Mr. Chase employs a methodology that grossly overcompensates Wonderland by awarding it, in essence, a "hold-up" royalty, rather than one that is based on the actual value of the patented feature.  In particular, Mr. Chase opines that, despite the relative insignificance of the patented feature, the costs and profits associated with the entire accused product are at risk and Thorley's only recourse to avoid a total loss is to pay the at risk amount to Wonderland.

Mr. Chase's opinions should be excluded for at least three reasons.  First, for some of his opinions,[1] he applies the wrong hypothetical negotiation date, which is a threshold issue in assessing reasonable royalty damages.   Second, where he does apply the correct date, he improperly ignores it in favor of a later date.  Finally, Mr. Chase fails to calculate a reasonable royalty that is tied to the actual value of the patented feature, and thus grossly overcompensates Wonderland for the alleged infringement.  It is the Court's role to ensure that only reliable expert opinions reach the jury.  Mr. Chase's opinions do not meet this standard and should be excluded.

---

[1]      Over his two expert reports, Mr. Chase has presented a number of different opinions, each based on a different set of assumptions.

## II.     LEGAL FRAMEWORK

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  It is the court's responsibility to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

The admission of expert testimony is governed by the law of the circuit where the court is located.  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).  In this Circuit, the party offering an expert's testimony must establish its admissibility by a preponderance of the evidence.  *In re Paoli R.R Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).  To carry this burden, the party offering the expert must show that the expert's opinions are based on "methods and procedures of science" rather than "subjective belief or unsupported speculation."  *Daubert,* 509 U.S. at 590.  Neither *Daubert* nor the Rules of Evidence requires a court to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## III.    OVERVIEW OF MR. CHASE'S DAMAGES OPINIONS

The patent-in-suit, U.S. Patent No. RE 43,919 ("the '919 patent"),[2] relates to a baby crib in which the fabric is mounted on the bed frame such that the fabric is not exposed on the corners.   The accused product considered by Mr. Chase is the Thorley Breeze playard ("Breeze").  Mr. Chase's damage opinions are contained in two expert reports, an initial report

---

[2]       The '919 patent is a reissue of U.S. Patent No. 6,859,957.

submitted on June 16, 2014 ("Initial Report"; Ex. A), and a supplemental report ("Supp. Report"; Ex. B) submitted on September 9, 2014.

### A.       Mr. Chase's Initial Report

As part of his damages calculation, Mr. Chase accepts Thorley's contention that, as of the issue date of the '919 patent, Thorley had an inventory of units of the Breeze against which Wonderland was precluded from claiming damages by virtue of the absolute intervening rights doctrine.[3]   Initial Report, at 5.  Mr. Chase determined that this intervening rights inventory would be sold off on about June 26, 2013, at which time Thorley would begin selling units that were not subject to intervening rights.  *Id*. at 7.  Mr. Chase assumed that the sales of these units not subject to intervening rights would constitute the "first infringement," and thus the date of the hypothetical negotiation would occur at this time.  *Id.*

Having established what he believed to be the date of the hypothetical negotiation, Mr. Chase then determined the reasonable royalty that the parties would have agreed to by analyzing, as of that date, the total amount Thorley had "at risk" if it was not able to continue selling the accused version of the Breeze.  *Id*. at 8. Using Thorley's actual, real world ordering history, Mr. Chase concluded that Thorley ordered ███ units at a cost of ███ between January 15, 2013 and June 26, 2013.  *Id*. at 11.  Mr. Chase assumed that Thorley could easily modify the Breeze and begin selling a new, non-infringing version, but that it would take about ██ days to receive this modified version from the manufacturer, during which time Thorley would be off the market.  *Id*. at 12.  Mr. Chase calculated that Thorley would lose about ███ in contribution margin from this market absence.  *Id.*  All told, as of the hypothetical negotiation date, Mr. Chase

---

[3]       The intervening rights doctrine prevents a patentee asserting infringement of a reissue patent from collecting damages for products that were in existence at the time the reissue patent was granted, except if those products infringe a claim in the reissue patent that was also present in the original patent.  *See generally BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214 (Fed. Cir. 1993).

concluded that Thorley faced a total cost impact of about ▮▮ in lost inventory and margin if it had to immediately stop selling the original Breeze design due to the '919 patent. *Id*. at 22.

For reasons that are not clear, Mr. Chase opines that a starting point to consider for a reasonable royalty on a fully paid up license to the patent would be an equal splitting of this ▮▮ cost impact between the parties. *Id*. at 22. However, Mr. Chase ultimately concludes that a more reasonable result would be for Thorley to bear the entire ▮▮ cost impact. *Id*. Based on the further assumption that the parties would agree to a limited term license only for the amount of time it would take Thorley to sell off the then-existing inventory, Mr. Chase "apportions" this ▮▮ sum between the remaining term of the patent (10.8 years) and the 1.1 years it would take Thorley to sell off the inventory on hand as of the hypothetical negotiation date. *Id*. at 23-24. Mr. Chase concludes that Thorley would have agreed to pay Wonderland ▮▮ for a license for a little over 1 year at which time Thorley would begin selling the modified design. *Id.* at 24.

However, Mr. Chase was not done. Despite assuming that Thorley would replace the infringing version with the modified version on June 26, 2013, he further calculates what Thorley would owe for each additional month in which orders of the original design continued. *Id*. at 24. Using the same considerations discussed above, he concluded that Thorley would owe Wonderland $22,000 for each month in which units of the original design were ordered, irrespective of how many units happened to be ordered that month. *Id*. Because, in the real world, Thorley has continued with the original design, Mr. Chase applies this $22,000 figure to every month from June 2013 (the hypothetical negotiation date) to June 2014 (the date of his report). *Id*. at 24. In sum, Mr. Chase opined that a reasonable royalty from June 2013 through June 2014 is ▮▮. *Id*. at 24. By way of comparison, Thorley's total real-world contribution from the Breeze from January 2013 through March 2014 was ▮▮. *Id*. at Attach. 400.

4

**B.     Mr. Chase's Supplemental Report**

On July 31, 2014, Thorley's expert, Mr. Mark Gleason, submitted his rebuttal report critiquing Mr. Chase's methodology and setting forth his opinion on a reasonable royalty.   On September 9, 2014, two months after the deadline for opening expert reports and without seeking leave of court, Mr. Chase submitted a supplemental report to address information discussed in Mr. Gleason's report and to present different damages scenarios assuming hypothetical negotiation dates other than the June 26, 2013 date applied in his initial report.  Supp. Report at 1.[4]  In one scenario, Mr. Chase assumed that the hypothetical negotiation date was January 15, 2013, the date the patent issued.  *Id*. at 4.  In another, Mr. Chase assumed that the hypothetical negotiation was May 8, 2013, which is a date Thorley imported units not subject to intervening rights.  *Id*. at 7.  During his deposition, Mr. Chase confirmed that he was no longer relying on the June 26, 2013 date from his initial report, recognizing that this date was not appropriate.  Ex. C [Chase Dep.] at 62:8-25.   Mr. Chase also changed the way in which he calculated the contribution margin at risk, which pushed his numbers even higher.  Supp. Report at 8-9.

When applying January 15, 2013 as the date of the hypothetical negotiation, Mr. Chase assumed that the existence of intervening rights inventory was a fact known to the parties.[5]  Supp. Report at 4.   Mr. Chase concluded that the result of the parties' January 15, 2013 negotiation would be that Thorley would implement a new design, have the new design in place before the intervening rights inventory was exhausted, and pay no royalty to Wonderland.  *Id*. at

---

[4]     Mr. Chase claimed in his Initial Report that the same methodology would apply regardless of the hypothetical negotiation date.  Initial Report, fn. 20.  Nevertheless, he applied a different methodology in his Supplemental Report.

[5]     In his deposition, Mr. Chase also explained yet another scenario in which January 15, 2013 was the hypothetical negotiation date, but the existence of intervening rights inventory was *not* known to the parties.  Ex. C [Chase Dep.] at 50:24-51:8.  In this scenario, he would apply the same methodology outlined in his initial report, using the inventory on hand as of January 15, 2013, but also updated to reflect additional information from the supplemental report.  *Id*.

5.   However, Mr. Chase then remarkably assumed that Thorley failed to implement the new design (despite its agreement to do so), continued ordering units of the original design according to the real-world schedule, and engaged Wonderland in a ***second*** hypothetical negotiation on May 8, 2013, at which time Thorley would suddenly find itself with thousands of infringing units that were somehow at a risk of total loss without a license.  *Id*. at 6-7.  From there, Mr. Chase applied the same general methodology as outlined above—determining the cost of on-hand inventory, determining the lost margin Thorley faced if it was off of the market while implementing a new design, attributing the entire risk to Thorley, and apportioning that risk between the remaining life of the patent and the time it would take Thorley to implement a design around.[6]  *Id*. at 8-11.  Mr. Chase's methodology of calculating lost contribution margin varied from in his initial report.  In his supplemental report, he assumed that, during the time in which Thorley was implementing the new design, it would continue ordering infringing units, and thus would face losing the margin attributable to selling these units.  *Id*. at 8-9.  While the contribution margin at risk under the methodology in his initial report was about ███████, the margin at risk in his supplemental report was between ███ and ████.  *Id*. at 9.

Under the scenario in which May 8, 2013 was the hypothetical negotiation date, Mr. Chase applied the same general methodology as outlined above, though using the inventory on hand as of May 8, 2013 and assuming only one hypothetical negotiation.  *Id*. at 7-11.

Mr. Chase concluded his supplemental report by opining that his cost impact analysis actually "understates the value of a license to Thorley for a license covering the entire remaining life of the '919 patent," and that a further upward adjustment would be appropriate.  *Id*. at 13-14. He admits that he has no way to quantify this increase, but that he still intended to tell the jury

---

[6]    Why Thorley would implement a new design on May 8, 2013 but not on January 15, 2013 when it originally agreed to do so, was not explained.

that an upward adjustment, such as a percentage increase, doubling, or other factor, is appropriate and leave it to them to determine what increase to apply. *Id.* at 13-14.

## IV.    MR. CHASE'S DAMAGE THEORIES MUST BE EXCLUDED

### A.    Mr. Chase Cannot Apply a Hypothetical Negotiation Date Other than January 15, 2013

As described above, Mr. Chase assessed damages using a variety of hypothetical negotiation dates.  As the Federal Circuit has explained, "[t]he correct determination of [the hypothetical negotiation] date is essential for properly assessing damages." *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003).  Because the correct hypothetical negotiation date is January 15, 2013, the Court should exclude Mr. Chase's opinions to the extent they are based on other dates.  As of that date, the '919 patent had issued and Thorley was actively selling, offering to sell, and importing the accused Breeze design.

The Federal Circuit has consistently adhered to the principle that, for purposes of determining a reasonable royalty based on a hypothetical negotiation between the parties, the hypothetical negotiation occurs just before the infringement began.  *LaserDynamics, Inc. v. Quanta Computers, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012).  Indeed, Mr. Chase agrees with this general principle.  Initial Report at 7 ("The hypothetical negotiation is conducted on the date of first infringement… .").  Thus, it is important to determine when infringement began.

Section 271 of the Patent Act ("Infringement of patent") provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  35 U.S.C. § 271(a).  The Breeze was on sale as of the date the '919 patent issued and it is presumed for purposes of calculating damages that the Breeze infringes.  Thus, on the day the '919 patent issued, Thorley was, without authority, selling, offering to sell, and

7

importing the patented invention, which constitutes infringement under Section 271(a). Accordingly, the date of first infringement is January 15, 2013, the date the patent issued.

The existence of intervening rights does not affect this determination and Mr. Chase's attempt to shift the date forward in time to increase the damage number must be rejected. While Section 271(a) allows for exceptions to the general rule regarding infringing conduct, intervening rights does not give rise to any such exception. While rare, the Patent Act makes it abundantly clear when conduct is exempted from infringement. Most notable is the "experimental use" exception, codified in 35 U.S.C. § 271(e), which explicitly provides that:

> **It shall not be an act of infringement** to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

35 U.S.C. § 271(e)(1) (emphasis added).

The intervening rights statute, on the contrary, does not provide that intervening rights is an exception to infringement. 35 U.S.C. § 252. Indeed, intervening rights, which is an affirmative defense, is routinely recognized as a limitation on *damages*, rather than an exception to infringement. *See BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1222 (Fed. Cir. 1993) (defendant could raise intervening rights defense in damages phase, rather than liability phase, because the effect of the defense was to reduce the amount of damages the defendant must pay); *see also Giese v. Pierce Chem. Co.*, 43 F. Supp. 2d 98, 112 (D. Mass. 1999) ("A successful intervening rights defense does not compel a judgment of non-infringement; rather, it is a limitation on damages that may be awarded to the plaintiff once infringement has been determined."); *StemCells Inc. v. Neuralstem Inc.*, No. AW-06-1877, 2009 WL 3681653, *2 (D. Md. Oct. 30, 2009) (Intervening rights is an affirmative defense limiting

damages but "'does not compel judgment of non-infringement.'") (quoting *Giese*; *I-Flow Corp. v. Apex Med. Techs., Inc.*, No. 07-cv-1200, 2010 WL 144405, *3 (S.D. Cal. Jan. 12, 2010) ("The doctrine of absolute intervening rights . . . provides accused infringers with an affirmative defense that limits infringement damages.")

Because intervening rights goes to the question of what damages are appropriate, rather than whether an infringement has occurred in the first instance, it does not affect the hypothetical negotiation date.  *See LaserDynamics*, 694 F.3d at 75 ("We have also been careful to distinguish the hypothetical negotiation date from other dates that trigger infringement liability.").  In *LaserDynamics*, the court held that the hypothetical negotiation in the inducement context occurred when an underlying act of direct infringement by a third party first occurred, not when the defendant was first liable for knowingly inducing that conduct.  694 F.3d at 76.  Similarly, in *Wang Labs., Inc. v. Toshiba Corp.*, the Federal Circuit held that the date of the hypothetical negotiation was the date when infringing products were first sold, even though damages could not be collected until sometime later.  993 F.2d 858, 870 (Fed. Cir. 1993).  Thus, in assessing the hypothetical negotiation date, it is important to consider when infringement first occurred, irrespective of whether damages were available for that infringement.

As explained above, the date of first infringement in this case is January 15, 2013 since, as of that date, the '919 patent had issued and Thorley was selling an allegedly infringing product.  This is entirely consistent with the general rule that "negotiations should have been hypothesized at the start of infringement, i.e., when both a patent had issued and accused products were sold."  *Wang*, 993 F.2d at 869.  This is also entirely consistent with the purpose of the hypothetical negotiation construct, which seeks to answer the question of what the parties, having full knowledge of the facts and circumstances, would have agreed to instead of allowing

infringement to take place.  *LaserDynamics*, 694 F.3d at 76.  Here, as of January 15, 2013, the parties would have known of the patent and that Thorley was and would continue selling and offering for sale an infringing product.  Thus, a negotiation at that time would have avoided any infringement of the patent taking place.[7]  Mr. Chase's opinions that are premised on a date of first infringement that occurred after that date, such as June 26, 2013 (as in his initial report) and May 8, 2013 (as in his supplemental report) should be excluded.

### B.     Mr. Chase's Use of Two Hypothetical Negotiation Dates Is Contrary to Law

One of the theories advanced in Mr. Chase's supplemental report relies upon the exceptional and, to Thorley's knowledge, unprecedented assumption that the parties would have engaged in two separate hypothetical negotiations—one on January 15, 2013 and another on May 8, 2013.  Mr. Chase should not be permitted to advance opinions based on this assumption.

Except in the rare case where the sales of two different products caused two infringements beginning at different times, Thorley is unaware of any instances in which the Federal Circuit has approved of multiple hypothetical negotiation dates.  *See Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1363-64 (Fed. Cir. 2006) (separate hypothetical negotiations required when two products, first offered for sale at different times, were involved). Just recently the Federal Circuit stated that "in each case there should be only a single hypothetical negotiation date, not separate dates for separate acts of infringement." *LaserDynamics*, 694 F.3d at 76.  This is not surprising given the purpose behind the hypothetical

---

[7]     While application of the January 15, 2013 date is straightforward, Mr. Chase's methodology requires first determining when there was a manufacture, use, sale, offer for sale, or importation of a unit not subject to intervening rights.  Initially, Mr. Chase assumed this date was June 26, 2013, based on a sale.  Initial Report at 7.  Then, he revised it to assume May 8, 2013, based on an importation.  Supp. Report at 7.  However, neither of these dates accounts for the fact that Thorley has been continuously offering to sell the Breeze since before January 15, 2013. A product need not exist to be the subject of an infringing offer for sale.  *See 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir.1998) (offer to sell liability was added to prevent infringers from "generating interest in a potential infringing product.")

negotiation construct.  In particular, "[t]he hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).  Mr. Chase's methodology ignores this basic principle that the parties would have reached an ***agreement*** at the time of the hypothetical negotiation.

The practical effect of Mr. Chase's methodology is that the actual negotiation occurred much later.  Indeed, Mr. Chase characterizes Section V of his supplemental report ("May 8, 2013 As the Date of First Infringement") as "address[ing] the reasonable royalty damages that are appropriate for Thorley's infringement that is not covered by intervening rights, whether as a second hypothetical negotiation . . . or as the first hypothetical negotiation on May 8, 2013." Supp. Rep. at 6-7.  In other words, Mr. Chase comes to the exact same result using January 15th as he does using May 8th by simply pretending the January 15th negotiation never happened. This untested methodology does not reliably capture what the parties would have agreed to just before infringement began because it assumes there was no agreement (or, if there was, it was illusory).  It further makes the completely irrational assumption that Thorley, having recognized that the patent was valid and infringed as part of the first negotiation, would nevertheless continue ordering infringing units rather than implement a design around which, everyone agrees, could be easily implemented.  In this way, Mr. Chase delays the hypothetical negotiation to a time that better suits Wonderland's "hold-up" position, contrary to established precedent and his own assumption that the hypothetical negotiation occurs just before infringement began.

Mr. Chase should not be permitted to present this fundamentally flawed methodology to the jury.  This is not an issue which could be cured through cross-examination.

**C.     Mr. Chase's Use of the "Total Cost Impact" Is Not a Reliable Method for Determining a Reasonable Royalty**

Mr. Chase's methodology is further flawed in that his use of the "total cost impact" is completely arbitrary and grossly overstates the value of the patented feature.

1.     Mr. Chase Does Not Provide a Reliable Basis to Assume the "Total Cost Impact" Constitutes a Reasonable Royalty for the Life of the Patent

As described above, Mr. Chase calculates the "total cost impact" faced by Thorley as of the hypothetical negotiation date, which conveniently comes to approximately ███ regardless of which date he uses.  He then states that a fully paid up license to the '919 patent should be (at least) this amount.  Initial Report at 22; Supp. Report at 11.  Mr. Chase has not, however, provided any reasonable explanation for why the "total cost impact" at the date of the hypothetical negotiation is a reliable indicator of the value of a fully paid up license.  His lack of analysis is most clearly on display on page 22 of his Initial Report, where without any explanation he leaps from the final tally of the total cost impact to the conclusion that this is also a reasonably royalty that "naturally contemplate a license structure covering the entire remaining term of the patent."  Initial Report at 22.  This is a classic case of a conclusion (the amount of a fully paid up license) that is connected to the data (the total cost impact) by nothing more than the *ipse dixit* of an expert.  Mr. Chase should not be permitted to testify that there is a connection between these two points when he has completely failed to explain that connection in his reports.

2.     Mr. Chase Fails to Separate Damages Between the Patented and Unpatented Features

In attributing the ***total*** cost impact allegedly faced by Thorley to the '919 patent, Mr. Chase grossly overstates the value of the patent feature.  In other words, despite accepting Thorley's position that the fabric attachment feature has nothing to do with the overall innovation or market appeal of the Breeze, Mr. Chase nevertheless fails to separate or apportion

the damages between the patented and unpatented features, and thus attributes far more value to the patented feature than is warranted by the circumstances.

There has been an increased emphasis in recent years in ensuring that, where a patent covers but one feature of a multi-feature product, a reasonable royalty analysis "does not overreach and encompass components not covered by the patent." *LaserDynamics*, 694 F.3d at 70.  To that end, the Federal Circuit recently reaffirmed that "'[a] patentee may assess damages based on the entire market value of the accused product ***only where*** the patented feature creates the basis for customer demand or substantially creates the value of the component parts.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) (emphasis added). Absent such a showing, principles of apportionment apply and require the patentee to separate the damages between the patented features and the unpatented features.  *Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).  This is true even where the accused product constitutes the smallest saleable unit that contains the patented feature.  *Id*.  Mr. Chase's methodology runs afoul of these clear instructions by effectively attributing the entire value of the accused product to the minor patented feature.

According to Mr. Chase, the '919 patent relates to a playard in which the fabric enclosure is attached to the corner posts of the playard frame such that the corner posts remain exposed. Initial Report at 3.  This fabric attachment feature is clearly but one component of the Breeze, and a minor one in that.  There is not a shred of evidence that this feature drives demand for the Breeze or otherwise contributes to its overall value, and Mr. Chase does not even attempt to show otherwise.  In fact, Mr. Chase accepts Thorley's position that the fabric attachment feature has nothing to do with the true innovation in the Breeze, does not affect its market appeal, and

could be easily designed around with relatively little cost.  Initial Report at 20-21.  Thus, Mr. Chase was required to separate the damages between the patented and non-patented features.

This, he did not do.  In fact, he did not even try.  Instead, he sidestepped the issue by summarily concluding that "it is difficult to trace and segregate the benefits of the patent from other attributes in the accused breeze® playards."  Initial Report at 19.  When asked during his deposition how his methodology accounts for the other technology in the Breeze, Mr. Chase freely admitted that "it doesn't try to measure anything with respect to . . . apportioning those aspect of the breeze®."  Chase Dep. at 35:19-24.  But the relative difficulty in apportioning the value does not mean he can simply elect not to do it.

While Wonderland may argue that Mr. Chase was not required to perform an apportionment in this case since he based his damages opinion on an analysis of the cost impact rather than the sales price, this is a distinction without a difference.  "No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."  *Virnetx*, 767 F.3d at 1326.  Mr. Chase's total cost impact includes the entire cost of the existing inventory and the entire margin that Thorley stood to lose in foregone sales.  By assuming that this total cost impact was "at risk" because of the patented feature, Mr. Chase effectively attributes all of the value to the '919 patent and leaves no value (in terms of cost and foregone profits) to the many other components of the Breeze.  This disconnect is clearly reflected in Mr. Chase's ultimate conclusion that, despite the insignificance of the patented feature, Thorley should still pay ***all*** of the cost impact to Wonderland as a royalty.  This type of overcompensation is exactly what the Federal Circuit has railed against.  *See LaserDynamics*, 694 F.3d at 67 ("Where small elements of multi-component products are accused of

infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.")

Mr. Chase should not be permitted to suggest to the jury that the total cost impact fairly reflects the value of the '919 patent as there is no reliable basis for this conclusion.

3.      There is No Basis to Shift the Entire "Total Cost Impact" to Thorley

Finally, Mr. Chase's decision to shift the entire cost impact to Thorley is completely arbitrary and ignores the fundamental assumption that the parties to the negotiation are ***willing*** parties.  In effect, Mr. Chase concludes that since Wonderland would prefer to not license its patent, it can demand that Thorley pay 100% of the total cost impact, and Thorley will accept it. This is not a reasonable result.  A similar methodology was rejected in *Nordock Inc. v. Systems Inc.*, in which the plaintiff's damages expert asserted that a reasonable royalty would be 100 percent of the plaintiff's lost sales.  No. 11-c-118, 2013 WL 989864, *8 (E.D. Wis. March 13, 2013).  In rejecting this premise, the court correctly noted that a reasonable royalty requires willing parties, that a 100% royalty figure does not reflect the plaintiff being a willing party, and that the reasonable royalty analysis was unreliable and excluded.  *Nordock*, 2013 WL 989864 at *8.  The same result should be reached here.

## V.      CONCLUSION

Because Mr. Chase's opinions are not the subject of reliable principles and methods, and he has not reasonably tied his methodology to the facts of the case, his opinions should be excluded.

Dated: October 27, 2014                    Respectfully submitted,

                                           THE WEBB LAW FIRM


                                           s/ *Bryan P. Clark*
                                           Kent E. Baldauf, Jr.
                                           PA ID No. 70793
                                           Bryan P. Clark
                                           PA ID No. 205708
                                           Ryan J. Miller
                                           PA ID No. 208015

                                           One Gateway Center
                                           420 Ft. Duquesne Blvd., Suite 1200
                                           Pittsburgh, PA 15222
                                           412.471.8815
                                           412.471.4094 (fax)
                                           kbaldaufjr@webblaw.com
                                           bclark@webblaw.com
                                           rmiller@webblaw.com
                                           *Attorneys for Defendant*

16

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 27th day of October, 2014, I electronically filed the foregoing redacted version of **DEFENDANT THORLEY INDUSTRIES LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MR. MICHAEL CHASE** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

An un-redacted version was filed with the Court and served on counsel of record by email.

THE WEBB LAW FIRM

<u>s/ *Bryan P. Clark*</u>
Bryan P. Clark