**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| WONDERLAND NURSERYGOODS CO., LTD., | ) ) ) | |
| | ) | Civil Action No. 2:13-cv-00387 |
| Plaintiff, | ) | |
| | ) | Judge Mark R. Hornak |
| v. | ) | |
| | ) | |
| | ) | |
| THORLEY INDUSTRIES LLC (*d/b/a* 4MOMS), | ) ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

**Mark R. Hornak, United States District Judge**

This is a patent case about a baby crib. Plaintiff, Wonderland Nurserygoods Co., Ltd. ("Wonderland"), has a patent entitled "Baby Crib," which is United States Patent No. RE 43,919 ("the '919 patent"). Wonderland alleges that Thorley Industries LLC d/b/a/ 4moms ("Thorley") infringed the '919 patent with its own product, the Breeze, a foldable child enclosure. Wonderland says that the Breeze impermissibly infringes the '919 patent. Thorley disagrees. Both parties ask for summary judgment on the issue of infringement. Wonderland also asks for summary judgment on the issue of validity, requesting that the Court determine as a matter of law that the '919 patent is not invalid.

The parties are also preparing for trial and have filed several Motions in Limine. Thorley filed two such motions, one of them to exclude part of the testimony of Jerry Drobinski, Wonderland's technical expert, and the other to exclude the entire testimony of Wonderland's damages expert, Michael Chase. Wonderland has made one motion in limine to exclude the testimony of Thorley's damages expert, Mark Gleason.

For the reasons that follow, the Court will deny the cross Motions for Summary Judgment on the issue of infringement; deny Wonderland's Motion for Summary Judgment on the issue of validity; grant Thorley's motion to exclude part of the testimony of Jerry Drobinski; grant Thorley's motion to exclude the testimony of Michael Chase; and deny Wonderland's motion to exclude the testimony of Mark Gleason.

## I.    BACKGROUND

This civil action for infringement involves Wonderland's United States Patent No. RE 43,919 ("the '919 patent"), which is entitled Baby Crib.  ECF No. 75-1.  On March 1, 2005, U.S. Patent No. 6,859,957 (the '957 patent) was granted.  ECF No. 74, at ¶2; ECF No. 93, at ¶2. Thereafter, on October 26, 2006, Wonderland filed an application to reissue the '957 patent, in order to seek broader claims.  ECF No. 74, at ¶3; ECF No. 93, at ¶3.  The Baby Crib is what it sounds like: a foldable child enclosure or a play yard or playpen.

Thorley, the Defendant, makes, uses, sells, and offers to sell a product called the Breeze, which is a foldable child enclosure.  ECF No. 71, at ¶1; ECF No. 92, at ¶1.  The Breeze is the accused product in this case.  *Id.*  Wonderland asserts that accused product infringes the '919 Patent in violation of 35 U.S.C. § 271.  ECF No. 1, at ¶¶9–10.

Wonderland claims that it is entitled to an entry of a permanent injunction against Thorley, pursuant to 35 U.S.C. § 283, to prevent further infringement.  *Id.*  Moreover, Wonderland asserts that it is entitled to damages plus interest, pursuant to 35 U.S.C. § 284, for past and current infringement.  *Id.*  Finally, Wonderland believes it should be awarded costs and fees under 35 U.S.C. § 285.  *Id.*  Thorley denies that it has infringed the '919 patent, ECF No. 15, and brings counterclaims for (1) a declaration of non-infringement of the '919 patent and (2) a declaration of invalidity of the '919 patent, *id.* at 4–6; ECF No. 29, at 5–7.

The primary disagreement between the parties with relation to the infringement issue is whether the Breeze literally infringes independent claim number 8 of the '919 Patent. Claim number 8 reads as follows:

> A baby crib comprising:
>
> A bed frame structure including a plurality of upright tubes, wherein each of the upright tubes, respectively, includes an outer wall and a receiving hole extending along a length of the upright tube, the outer wall having an outwardly facing surface and defining an outer contour shape of the upright tube;
>
> an enclosure member surrounding an enclosed space adapted for receiving a baby therein; and
>
> a plurality of positioning posts provided on the enclosure member at locations corresponding to the upright tubes, wherein the positioning posts are configured to lodge into the receiving holes of the upright tubes for supporting the enclosure member between the upright tubes, whereby the enclosure member extends from one upright tube generally in directions of other of the upright tubes substantially out of contact with the outwardly facing surfaces of the upright tubes, such that the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member.

ECF No. 1-2, at 10.

On December 4, 2013, the Court held a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996). Thereafter, on December 9, 2013, the Court issued an order construing the disputed terms in the '919 Patent. ECF No. 41. The resulting independent claim number 8 reads as follows, given the Court's construction (construed terms are noted in bold):

> A baby crib comprising:
>
> a bed frame structure including **more than one (1) upright tube**, wherein each of the upright tubes, respectively, includes an outer wall and a receiving hole **existing along all, or substantially all, of the full length of the tube** of the upright tube, the outer wall having an outwardly facing surface and defining an outer contour shape of the upright tube;
>
> an enclosure member surrounding an enclosed space adapted for receiving a baby therein; and

a plurality of positioning posts provided on the enclosure member at locations corresponding to the upright tubes, wherein the positioning posts are **shaped so as to remain of their own force in** the receiving holes of the upright tubes for supporting the enclosure member between the upright tubes, **whereby the material forming the enclosure extends from one upright tube generally in directions of other of the upright tubes in a manner that does not substantially bear against the outwardly facing surfaces of the upright tubes, such that the outwardly facing surface of each of the upright tubes is exposed on an outside of the material forming the enclosure**.

*Id.* at 1–2.

With the claim construed in this way, each party argues that it is the clear winner on the issue of infringement. On the issue of validity, Thorley has not moved for summary judgment that the '919 patent is invalid, but Wonderland has made a Motion for Summary Judgment of No Invalidity, ECF No. 72, and filed a supporting brief, ECF No. 73.

Despite believing that they are each entitled to summary judgment in some form, each party has also filed at least one motion in limine to exclude one or more of the other side's experts from testifying at trial. Thorley seeks to preclude parts of the testimony of Jerry Drobinski, Wonderland's technical expert, that relate to secondary considerations of nonobviousness, specifically his opinion that commercial success, instances of copying, industry praise, and licensing serve as evidence that the asserted claims of the '919 patent are not obvious. ECF No. 63; ECF No. 64, at 5. The other two motions in limine deal with each side's damages expert. Thorley wants to exclude the entire testimony of Wonderland's damages expert, Michael Chase. ECF No. 65. Wonderland has made one motion in limine to exclude testimony of Thorley's damages expert, Mark Gleason. ECF No. 67. On February 18, 2015, the Court heard extensive oral argument on all six (6) pending Motions.

## II.    APPLICABLE LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "On summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the nonmovant." *Crown Operations Int'l, Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citations omitted). Summary judgment is available in patent cases as in other areas of litigation. *Continental Can Co. USA, v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir. 1991). In a patent case, "[t]he patentee has the burden of proving infringement by a preponderance of the evidence." *Centricut, L.L.C. v. Esab Group, Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004).

"An infringement issue is properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001). "In particular, a trial court cannot reach a conclusive finding of noninfringement if the record shows some evidence supporting a finding of noninfringement and some evidence to the contrary." *AFG Indus., Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1371 (Fed. Cir. 2004). "To support a summary judgment of noninfringement it must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001).

"Because the determination of infringement is a question of fact, summary judgment of infringement is improper if a reasonable jury could find that not every limitation of the claim in question would be met by the [alleged infringer's] product." *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002) (internal citation omitted).

### B. <u>Patent Infringement</u>

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). "Determining infringement is a two-step process. First, the court determines the scope and meaning of the asserted claim. Then, the court compares the properly construed claims with the accused device or product to reach a finding regarding infringement." *AFG Indus., Inc.*, 375 F.3d at 1371. The second step is a question of fact. *See Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). Literal infringement occurs where each limitation of at least one claim of the patent is found exactly in the alleged infringer's product. *Panduit Corp. v. Dennison Mfg. Co.*, 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

### C. <u>Validity</u>

Under 35 U.S.C. § 282, issued patents are presumed valid. This presumption of validity, however, may be rebutted. *Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 780 (Fed. Cir. 1983). "[A] moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise." *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1340 (Fed. Cir. 2010) (internal quotation marks omitted). By contrast, "summary judgment of no invalidity is

appropriate when no reasonable jury could find by clear and convincing evidence that the claims are invalid." *Douglas Dynamics, LLC v. Buyers Products Co.*, No. 09-261, 2014 WL 988755, at *2 (W.D. Wis. Mar. 13, 2014) (citing *Central Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.,* 482 F.3d 1347, 1357–58 (Fed. Cir. 2007)). The presumption of validity found in § 282 is reflected in the heightened standard of proof required to prove invalidity. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245–46 (2011). Whether a patent claim is invalid as anticipated is a question of fact. *IPXL Holdings, L.L.C. v. Amazon .com, Inc.,* 430 F.3d 1377, 1380 (Fed. Cir. 2005).

### D. *Daubert* Motions

Federal Rule of Evidence 702 reads as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. It is the court's responsibility to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

The admission of expert testimony is governed by the law of the circuit where the court is located. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed. Cir. 2003). In this Circuit, the party offering an expert's testimony must establish its admissibility by a preponderance of the evidence. *In re Paoli R.R Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). Rule 702 has two major requirements: "The first is that a witness proffered to testify to specialized knowledge must be an expert;" and "the second requirement of Rule 702 is that the

expert must testify to 'scientific, technical or other specialized knowledge [that] will assist the trier of fact.'" *Id.* at 741–42 (quoting Fed. R. Evid. 702). As to the first requirement, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *Id.* at 741. The factors that are considered important in the analysis of the second requirement include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n.8. "Admissibility thus depends in part upon the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (internal quotation marks omitted).

This standard is not a high one. *Id.* A party only has to demonstrate by a preponderance of the evidence that an opinion is based on valid reasoning and reliable methodology. *Id.* at 146. Finally, a court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used," and a court "may conclude that there is simply too great a gap between the data and the opinion proffered." *Id.* (internal quotation marks omitted).

## III.   SUMMARY JUDGMENT MOTIONS

### A.  Cross Motions for Summary Judgment on Infringement

Both Wonderland and Thorley seek summary judgment on the issue of infringement. Wonderland says that no reasonable jury could find that Thorley's product, the Breeze, *does not* infringe, while Thorley says that no reasonable jury could find that the Breeze *does* infringe.

Because these are independent summary judgment motions, the Court is constrained to view the evidence in the light most favorable to the party opposing each motion, with doubts resolved in favor of each nonmovant. *Crown Operations,* 289 F.3d at 1375. In other words, if, viewing the evidence in the light most favorable to Thorley, it is clear that every limitation of the '919 patent is met in the Breeze, then Wonderland should get summary judgment; and if, viewing the evidence in the light most favorable to Wonderland, it is clear that at least one limitation of the '919 patent is not met, then Thorley should get summary judgment.

Wonderland asserts that there are no genuine issues of material fact about whether Thorley's Breeze play yard embodies each of the limitations of claim 8 of the patent.[1] In other words, Wonderland asserts that, viewing the facts in the light most favorable to Thorley, no reasonable factfinder could conclude that any one of the limitations of claim 8 is not met by Thorley's Breeze. If there is a genuine issue of material fact as to even one of the limitations of claim 8, however, this Court must deny Wonderland's Motion for Summary Judgment. Thus, the question the Court must ask is, could a reasonable jury find that Thorley's Breeze does not meet at least one of the limitations in claim 8? Conversely, Thorley asserts that at least two of the limitations of claim 8 are not met by the Breeze—and that no reasonable factfinder could conclude otherwise—and that therefore the Court should grant it summary judgment on either independent basis.

There are essentially three big issues common to these dueling summary judgment motions on the issue of infringement. Several of the limitations in claim 8 are undisputed. *See*

---

[1] Wonderland has also asserted that claims 9 and 14 are infringed by the Breeze, but, because claims 9 and 14 are dependent claims, Thorley has relied on its argument that claim 8 is noninfringing to support its argument that claims 9 and 14 do not infringe. *See Wahpeton Canvas Co., Inc. v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed. Cir. 1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed."). So if the Court concludes that there is a genuine issue of material fact as to any of the limitations in claim 8, then there is also an issue with respect to these two dependent claims.

[ECF No. 70, at 6](#)–7; [ECF No. 87, at 7](#)–22; [ECF No. 60, at 4](#).[2]  The three disputed issues are as

follows: (1) whether "an" outer wall means the entire outer wall or just a section of that wall; (2)

whether the "receiving hole" of the Breeze play yard extends substantially the full length of the

upright tube; and (3) whether the positioning post of the Breeze play yard is "on" the enclosure

member.  *See* [ECF No. 70, at 9](#)–19; [ECF No. 60, at 8](#)–23; and [ECF No. 87, at 7](#)–22.

### 1.  <u>Outer Wall</u>

Do the upright tubes on the Breeze have "an outer wall" with "the outer wall having an

outwardly facing surface and defining an outer contour shape of the upright tube"?  Wonderland

says yes.  The disagreement, according to Wonderland, comes down to the difference between

the indefinite and the definite article—that is, claim 8 only requires the existence of "an" outer

wall that has an outwardly facing surface.  Wonderland says that the upright tubes on the Breeze

have more than one outer wall and that the limitation in claim 8 can refer to any of them.  Thus:



[ECF No. 70, at 10](#); *see also* [ECF No. 71, at ¶ 4](#); [ECF No. 92, at ¶ 4](#).

Thorley argues that the red highlighted portion in the above depiction of the Breeze's

upright tube (depicted by the darker shaded border called out by the points) is not "an outer wall"

---

[2] In its Motion for Summary Judgment of Non-infringement, Thorley points to only two of the three issues (the "positioning post" and the "outer wall" issues), [ECF No. 60, at 4](#), but in opposing Wonderland's Motion for Summary Judgment, Thorley indicates that there are three issues, [ECF No. 87](#).

because it is merely a portion of the outer wall and that this Court rejected such a meaning of "an outer wall" in its claim construction.  ECF No. 87, at 8.  Thorley says that the Breeze's upright tubes have only one outer wall and that the contour of the outer wall can be seen (the darker or red lines) in the following depiction:



ECF No. 87, at 10.

Wonderland counters that the above depiction, created by Thorley's expert, Mr. Cuffaro, shows two distinct structures in what he alleges is a single outer wall—meaning, he is actually showing two outer walls, one of which is "outwardly facing."  Wonderland also points to an important rule regarding the indefinite article:

> That "a" or "an" can mean "one or more" is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to the "indefinite article" rule are extremely limited: a patentee must evince a clear intent to limit "a" or "an" to "one." The subsequent use of definite articles "the" or "said" in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that nonsingular meaning. An exception to the general rule that "a" or "an" means more than one only arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule.

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008) (citations, alterations, and quotation marks omitted).

The Court concludes that no reasonable jury could find that the Breeze does not meet this limitation. Even viewing the opinions of Thorley's expert in the light most favorable to Thorley, the second depiction above clearly shows two distinct outer walls, one of which is outwardly facing. Thus, that limitation of claim 8 is plainly met by the Breeze.[3]

### 2. **Receiving Hole**

Claim 8 calls for a "receiving hole" in the upright tube. Specifically, claim 8 calls for "a receiving hole **extending along a length** of the upright tube," and the Court construed the portion in bold as "existing along all, or substantially all, of the length of the tube." ECF No. 41, at 2. Wonderland says that the Breeze has a receiving hole that exists along "substantially all" of the length of the tube for two reasons: first, Thorley's own expert measured the tube, including the upper and lower extensions that provide foundations for the upper and lower corner components and found that the fabric supporting section (i.e., with the receiving hole) is approximately 74% of the total tube length, which, according to Wonderland, is by any definition a "substantial portion"; second, the only reason that the number is as low as it is (74%) is that Thorley's expert included in his measurements certain corner components that, to Wonderland, are not part of the upright tube at all. But Wonderland says that, no matter how you cut it, there is no genuine issue of fact that the receiving hole extends substantially the full length of the upright tube in the Breeze play yard.

Thorley responds first by saying that Wonderland fails to present any expert testimony to advance its position that the receiving holes extend along the length of the tube and instead relies

<hr/>

[3] Although Wonderland's Motion for Summary Judgment is denied based on other limitations in the '919 patent, this issue regarding outer walls is clear and therefore not a subject for trial.

only on attorney argument.  ECF No. 87, at 21.  Thorley also notes that its expert, Mr. Cuffaro, isolated and analyzed one of the upright tubes and found that the "receiving hole" extends less than 75% of the full length of the upright tube, a finding from which he concluded that the "receiving hole" does not exist along all or substantially all of the tube.[4]  Thorley says that "[b]ased on the above analysis, Mr. Cuffaro reached the conclusion that the 'receiving hole' did not exist along all or substantially all of the full length of the upright tube."  ECF No. 87, at 20. At oral argument, the Court asked Thorley's counsel to further explain why Mr. Cuffaro concluded that 74% was not "substantially all" of the tube:

\*\*\*\*\*\*\*\*\*\*\*

THE COURT:

Well, let's assume I deny Mr. Roche's motion for summary judgment on this. Let's assume that we have to go to trial. . . . So what's your argument to the jury that 74.2 percent is not substantially all? Ladies and gentlemen of the jury, you heard this guy just argue this. Let me tell you why that isn't so.

MR. CLARK:

Our argument is that our expert witness reviewed this, measured it, looked at it, concluded that this -- these were measurements our expert did. There was no measurements done by -- on the other side. And our expert reviewed the results of his measurement, looked at the specification, and said: 74 percent in my view is not substantially all the length.

THE COURT:

And remind me, why did he say that? Why did he come to that conclusion?

MR. CLARK:

He came to the conclusion because that's what he believes one skilled in the art would conclude.[5]

\*\*\*\*\*\*\*\*\*\*\*

ECF No. 128, at 60.

---

[4] He does not say why 75% is the critical cut-off point.

[5] Facially, not far different from a position based on the principle of "because I said so."

So who's right?  Is 74% substantially all of an upright tube?  Or, to put it differently, if a jury concluded that 74% was not substantially all of a tube, would the Court be required to set aside the verdict?  Consider any or all of the following hypotheticals: If a person ate 74 M&M's out of a bag of 100, has he eaten substantially all of the bag?  Probably.  If Jorden Spieth chips 74 golf balls out of 100 onto a green, has he chipped substantially all of his shots onto the green?  Likely.  If, on a 100 mile journey, having driven 74 miles, has a driver driven substantially all of the way there?  Closer case, but also likely.  What about 740 miles on a 1000 mile journey? Has she, notwithstanding the remaining 260 mile drive, gone substantially the full distance?  Probably not.  If a federal judge is confirmed by the vote of 74 members of the United States Senate, did substantially all of the Senators confirm her?  Probably depends on who you ask.  If a mountain climber hikes 74% of the way up Mount Everest, can he tell people that he climbed substantially all of Mount Everest without being a liar?  Probably not anyone who has climbed the entire way.

Given the foundational sparseness of Mr. Cuffaro's conclusory opinion, these examples from daily life[6] animate why the Court cannot say that no reasonable jury could conclude that 74% is not substantially all of the tube, nor can the Court conclude that a jury must conclude that it is.  Put another way, the Court cannot say that 74% is or is not, as a matter of law, "substantially all."  Therefore, this limitation is not met as a matter of law by the Breeze, and Wonderland's Motion for Summary Judgment must be denied on that basis.  By the same token, 74% may actually be "substantially all" of an upright tube, especially if Wonderland is correct in saying that the upper and lower corner components should not be considered part of the upright

---

[6] Mr. Cuffaro did not connect his 75% cutoff point to anything specific to "the art," or "ordinary skill in the art," or really anything other than what he thought.  Therefore, such more prosaic examples are not inapt.

tube (in which case, the receiving hole would extend along the entirety of the upright tube). Thus, Thorley's Motion for Summary Judgment of Non-infringement is denied.

### 3. Positioning Post

Wonderland asserts that there is no dispute that the Breeze play yard also meets the limitation that the positioning post be "on" the enclosure member. Wonderland says that the two parts that make up the Breeze positioning post are indisputably "on" the fabric because one part is sewn to the fabric and the other part is in full contact with the fabric. ECF No. 70, at 15. Wonderland says the issue is simple: on means on, and the term "on" is not linguistically obscure. Moreover, throughout the '919 patent, the term "on" is used to describe various embodiments of the patent that have corresponding figures that show that the rod is not "fixed" to the fabric, but is touching it in a way that allows the positioning post to become lodged in the hole and hold the fabric along the length of the upright tube:



FIG. 5 (Amended)

## The '919 Patent

ECF No. 70, at 17; *see also* ECF No. 70-2, at 8.

Thorley disagrees and claims that Wonderland has oversimplified the issue and that the actual language of the claim requires three things: (1) "positioning posts" that are (2) "provided

on the enclosure member" and (3) "configured to lodge into the receiving holes of the upright tubes." ECF No. 87, at 16. According to Thorley, Wonderland has failed to show that the Breeze meets any of these three sub-limitations. First, Thorley says that Breeze contains no "two-part positioning posts" but rather has two separate pieces, a flag piece and a locking member, which do not attach to or connect with each other. Second, Thorley says that, even assuming that the flag piece and locking member together constitute a two-part positioning post, Wonderland has failed to show that such a positioning post is "provided on" the enclosure. While the flag piece is sewn to the enclosure, the locking member is not sewn to, attached, or mounted on the enclosure. How then, asks Thorley, can it be "provided on" the enclosure? Third, Thorley says that the so-called two-part positioning post is not configured to lodge into the receiving hole. The Court construed the term "configured to lodge into" to mean "shaped so as to remain of their own force in," and Thorley says that the flag piece does not remain within the slot by way of its shape and will easily slide in and out of the slot unless it is held within the slot by the locking member, which is a completely separate second piece. ECF No. 87, at 18–19.

Wonderland counters that Thorley has failed to cite authority to support the proposition that the positioning post must be one piece; further, if the Court were to find that the positioning post was necessarily one piece, the Court would be reading a *function* into a structural element of the claims that is simply not there. ECF No. 111, at 8. As to the argument that "provided on" must mean "attached to," Wonderland says that "it is well understood that if claim language does not *require* a certain feature or method step, that is how the claim should be interpreted," and that interpreting "provided on" to mean "attached to" would. *Id.* at 9.

Again, who is right? Are the Breeze's positioning posts definitely "on" (or "provided on") the enclosure? Are they definitely *not* "on" the enclosure? Is it somewhere in between,

meaning that a reasonable jury could come out either way? The underlying question is really whether the so-called flag piece and locking member are distinct pieces or whether they together form a two-part positioning post. The Court concludes that there remains a genuine issue of material fact as to that issue, and Wonderland's Motion for Summary Judgment of Infringement is denied also on that basis. Moreover, Thorley's Motion for Summary Judgment of Non-infringement is likewise denied on that basis because it is possible that a jury could conclude that the Breeze meets all of the limitations of the '919 patent. Therefore, because "the record shows some evidence supporting a finding of non-infringement and some evidence to the contrary," *AFG Indus., Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1371 (Fed. Cir. 2004), both Motions for Summary Judgment on the issue of infringement are denied.

### B. **Wonderland's Motion for Summary Judgment of No Invalidity**

Wonderland argues that it is entitled to judgment as a matter of law that Thorley cannot meet its burden (clear and convincing evidence) to show that claims 8, 9 and 14 of U.S. Patent No. RE 43,919 are invalid, because there are no genuine issues of material fact with respect to either anticipation under 35 U.S.C. § 102, or obviousness under 35 U.S.C. § 103. ECF No. 72, at 1. Thorley disagrees, arguing that there is a genuine issue of material fact as to the issues of anticipation and nonobviousness. ECF No. 89.

#### 1. **Anticipation**

Pursuant to 35 U.S.C. § 102, novelty is a condition of patentability. A claim that does not satisfy the novelty requirement defined in § 102 is said to have been "anticipated." *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). "A determination that a claim is invalid as being anticipated or lacking novelty under 35 U.S.C. § 102 requires a finding that each and every limitation is found either expressly or inherently in a single prior art reference." *Id.*

(internal quotation marks omitted); *see also Hakim v. Cannon Avent Group, PLC,* 479 F.3d 1313, 1319 (Fed. Cir. 2007) ("'Anticipation' means that the claimed invention was previously known, and that all of the elements and limitations of the claim are described in a single prior art reference."). "Anticipation, though a question of fact, may be resolved on summary judgment if no genuine issue of material fact exists." *Ormco Corp. v. Align Tech., Inc.,* 498 F.3d 1307, 1319 (Fed. Cir. 2007). "Summary judgment is proper if no reasonable jury could find that the patent is not anticipated." *Zenith Elecs. Corp. v. PDI Commun. Sys.,* 522 F.3d 1348, 1357 (Fed. Cir. 2008).

At issue here are two prior art references: first, U.S. Patent No. 6,098,217 (the "Hammil" patent) and Australian Patent No. 715,883 (the "Bidwell" patent). Thorley says that these two patents anticipate the '919 patent—that is, all of the elements and limitations in the '919 patent are described in Hammil and also in Bidwell. ECF No. 89, at 11–16. Wonderland asserts that no reasonable jury could find that all of the elements and limitations of the '919 patent are present in either of these two prior art references. ECF No. 73, at 12–17. As to the Hammil patent, Wonderland says that it lacks two of the limitations found in the '919 patent: the Hammil's uprights are not tubes but rather posts, and the Hammil uprights do not have a "wall." *Id.* at 12. As to the Bidwell patent, Wonderland says that the Bidwell's "upright tubes" are not part of the structural frame as they are in the '919 patent. *Id.* at 14.

Thorley says, with respect to the Hammil patent, that there is more than enough evidence from which a reasonable jury could conclude that Hammil clearly and convincingly meets both the "upright tube" and the "outer wall" limitations. ECF No. 89, at 11. Thorley also argues that a reasonable jury could find by clear and convincing evidence that each limitation in the '919 patent is found in the Bidwell patent. Specifically, Thorley points out that Wonderland's sole

argument for why the Bidwell patent does not anticipate the '919 patent is that the tubes in the Bidwell patent are not "structural components," a requirement that is not actually part of the '919 patent. ECF No. 89, at 16.

With respect to the Hammil patent, the Court need only address the "upright tube" requirement. After a review of the briefs on the subject, ECF Nos. 73, 89, and 113, the expert report of Mr. Cuffaro, ECF No. 76-3, and the transcript of the oral argument on the point, ECF No. 128, at 99–105, the Court concludes that the Hammil patent quite simply does not employ tubes. It employs cylindrical upright posts—as the Court noted at oral argument, "[i]t might be a rod, it might be a stick, it might be a post, it might be a pole, but it doesn't leap off the page it's a tube," ECF No. 128, at 104—but the English language cannot be contorted in such a way that the posts of the Hammil patent could be considered tubes. This is simply not a tube:



Counsel for Thorley admitted at oral argument that a post without any slots in it could not be considered a tube. ECF No. 128, at 101–102. The Court then inquired:

THE COURT:

So cutting four slots in it makes it a tube?

MR. CLARK:

I think -- I think -- I think it would make it a tube.

*Id.* at 102. In an effort to dodge summary judgment based on Hammil, Thorley says that cutting four slots in a post could make that post a tube. The Court disagrees, as no reasonable jury could

find, by clear and convincing evidence, that the "vertical uprights" of the Hammil patent are tubes. To the contrary, the expert report of Mr. Cuffaro merely states that, in his opinion, the "vertical upright" limitation found in the Hammil patent is the same as the "upright tube" requirement in the '919 patent. *See* ECF No. 76-3, at 4. To meet its burden at trial, Thorley would have to present more than an expert's fiat that a post with four slots sliced into it is a tube. The Hammil patent simply does not anticipate the '919 patent.

As to the Bidwell patent, the Court concludes that there is a genuine issue of material fact about whether it anticipated the '919 patent. It is not self-evident from the Court's claim construction that the upright tubes must be structural components. Rather, the relevant portion of the claim, as construed by the Court, simply reads, "A baby crib comprising: a bed frame structure *including* more than one (1) upright tube. . . ." ECF No. 41, at 1–2 (emphasis added). The claim construction does *not* read, as Wonderland seems to imply, "A baby crib comprising: a bed frame including more than one (1) **structural** upright tube. . . ." (emphasis bolded). Is it possible, as Wonderland says, that "a person of ordinary skill in the art would read limitation #2 in a way that leads to the same conclusion, i.e., the upright tubes must be structural components"? ECF No. 15. At least plausibly maybe, of course. But it is also logically possible that a reasonable jury could conclude, by clear and convincing evidence, exactly the opposite. This question of fact remains as to the Bidwell patent.

## 2. **Nonobviousness**

Nonobviousness is a condition of patentability. 35 U.S.C. § 103 reads, in relevant part, as follows:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing

date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.

35 U.S.C. § 103. On the issue of obviousness, the Federal Circuit has explained:

> In a § 103 obviousness analysis, *Graham* [*v. John Deere Co.,* 383 U.S. 1 (1966)] requires that the trier assess certain underlying facts: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) the so-called "secondary considerations."

*King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 857 (Fed. Cir. 1985). In order for a party to invalidate a patent for obviousness, that party must demonstrate "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1361 (Fed. Cir. 2007). But "the overall obviousness inquiry must be expansive and flexible." *OSRAM*, 701 F.3d at 707 (citing *KSR Int'l Co. v. Teleflex, Inc.,* 550 U.S. 398, 415, 419 (2007)).

The Court concludes that a genuine issue of material fact remains as to whether the '919 patent is nonobvious.

First, Thorley's expert, Mr. Cuffaro, a professor of industrial design with experience in the field of product design, including in the context of baby products, is prepared to testify as follows: (1) various examples of baby cribs predate the '919 Patent by decades, ECF No. 94-1, at 31–36; (2) the technique of attaching the fabric enclosure to the play yard frame that is described in the '919 Patent was immediately recognizable to him as a keyhole slot method, *id*. at 27; (3) there are a number of publications from as far back as 100 years ago in which the keyhole slot method was used in attaching fabric to a rigid structure, in much the same way as is described in the '919 Patent, *id*. at 27-30; and (4) based on the ordinary steps in the process of product design, one skilled in the art, knowledgeable about the prior art, and tasked with designing a baby crib

would find it obvious to arrive at the claimed design, *id.* at 12–25. While the jury may not ultimately buy what Mr. Cuffaro is stating, his proffered testimony plausibly creates a genuine issue of fact as to obviousness and is sufficient to defeat summary judgment on the issue of invalidity.

Second, pursuant to the fourth factor in *Graham*, the "secondary considerations" do not establish the nonobviousness of the '919 patent. For the reasons discussed below, the testimony of Wonderland's expert, Jerry Drobinski, will be excluded to the extent he discusses secondary considerations of nonobviousness. Aside from Mr. Drobinski's inadmissible testimony, Wonderland has failed to put forth any secondary considerations of nonobviousness. In the absence of such evidence, a reasonable jury could find in favor of Thorley on the issue of obviousness by the requisite evidentiary standard. This too is sufficient to defeat summary judgment on the issue of invalidity.

In conclusion, drawing all inferences in Thorley's favor, the Court concludes that a reasonable jury could find, by clear and convincing evidence, that the '919 patent was anticipated and obvious. As such, Wonderland's Motion for Summary Judgment of No Invalidity is denied.

## IV.    MOTIONS IN LIMINE

Both parties move the Court to preclude the testimony of at least one expert under Federal Rule of Evidence 702.

### A.    Thorley's Motions in Limine

#### 1.    Motion to Exclude the Expert Testimony of Mr. Jerry Drobinski

Thorley seeks to exclude part of the testimony of Wonderland's expert, Jerry Drobinski, specifically his testimony regarding secondary considerations of non-obviousness, which

Wonderland wants to present as evidence of their patent's validity. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966) (explaining that objective evidence of nonobviousness such as commercial success, long felt need, copying, industry praise, and licensing might be used to rebut a *prima facie* showing that the claimed invention is obvious). Thorley says that Mr. Drobinski's proffered testimony on the nonobviousness of the '919 patent (to be established by discussing commercial success, instances of copying, industry praise, and licensing) fails to pass the *Daubert* test because (1) Mr. Drobinski is not qualified to opine on economic issues such as commercial success and licensing and (2) his opinions as to each of the alleged secondary considerations are "conclusory, speculative, and completely unreliable." ECF No. 64, at 5.

### a. Financial Opinions and Commercial Success

The Court concludes that Mr. Drobinski is not qualified to offer opinions on financial issues. Thorley rightly points out that, while Mr. Drobinski's CV shows that he is a consultant in the areas of product design, product development, manufacturing, and international sourcing, he lacks qualifications in the area of finance. Other district courts have reached the same conclusion in similar situations. *See Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 604 (N.D. Cal. 2008) (finding that an expert who had studied electrical engineering and designed semiconductor devices for over 33 years nevertheless "lack[ed] the expertise needed to testify about the commercial aspects of this inquiry"); *Lutron Electronics Co. v. Crestron Electronics, Inc.*, 970 F. Supp. 2d 1229, 1242 (D. Utah 2013) (holding that experts with backgrounds in electrical engineering were not qualified "to testify about the nexus between the patented features and the products' commercial success" and that "[t]he deficiencies cannot be corrected merely by cross-examination"); *XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 9-157, 2013 WL 865974, at *3 (D. Del. Mar. 7, 2013) (preventing an expert who had computer science and call

23

center expertise from giving conclusions on commercial success and industry acceptance because such conclusions exceeded his technical expertise).  The Court thus concludes that Mr. Drobinski is not qualified to give opinions on commercial success.

The Court will exclude Mr. Drobinski's testimony regarding commercial success on a separate basis as well.  Evidence of commercial success is "only significant if there is a nexus between the claimed invention and the commercial success."  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).  If a device's commercial success is due to an unclaimed feature (or a feature that was known in the prior art), commercial success is irrelevant.  *Id.; see also Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) ("Our case law clearly establishes that the patentee must establish a nexus between the evidence of commercial success and the patented invention."); *In re Huang,* 100 F.3d 135, 140 (Fed. Cir. 1996) (holding that the proponent must offer proof "that the sales were a direct result of the unique characteristics of the claimed invention"); *In re GPAC Inc.,* 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("For objective [evidence of secondary considerations] to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention."); *Lutron*, 970 F. Supp. 2d at 1239 ("To establish a nexus, an expert must have the requisite expertise to explain to the jury why the commercial success is due to the claimed invention rather than an unclaimed feature or other external factors. . . . [A]n expert must be qualified to do more than state a product incorporates a claimed invention; the product is successful; therefore the invention must have caused the commercial success.").

Considering Mr. Drobinski's report on the issue of commercial success, the Court concludes that Mr. Drobinski has failed to establish to a sufficient factual nexus between the commercial success of its products and the novel technology of the '919 patent.  Mr. Drobinski

was obligated to demonstrate by a preponderance of the evidence that his opinion in this regard was based on valid reasoning and reliable methodology, *Oddi v. Ford Motor Co.*, 234 F.3d at 145, and he has failed to do so. To the contrary, his report merely states:

> Wonderland has produced and sold hundreds of thousands of units of variants based on the novel technology of the '919 patent. Based at least in part on the reaction of Graco's management to the initial presentation (mentioned below), it is apparent that the success represented by these sales is due to the new exposed tube design of the '919 patent.

ECF No. 79-1, at 12. There appears to be *no* methodology behind to Mr. Drobinsky's conclusion about commercial success. Thus, Thorley's *Daubert* Motion is granted in this regard also.

### b. Copying

The Federal Circuit has explained that "copying by a competitor may be a relevant consideration in the secondary factor analysis" but that "copying requires the replication of a specific product." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). As explained by the Federal Circuit:

> This may be demonstrated either through internal documents, *see Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.,* 344 F.3d 1186, 1196–97 (Fed.Cir.2003); direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica, *see Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1285 (Fed. Cir. 2000); or access to, and substantial similarity to, the patented product (as opposed to the patent), *Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1027 (Fed. Cir. 1985), *overruled on other grounds by, Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1359 (Fed. Cir. 1999) (en banc).

*Id*. In this case, Mr. Drobinski has offered an opinion that there are in excess of 50 companies that have manufactured or sold products that are variants based on Wonderland patents: "Substantial copying of the exposed tube invention by many participants in the play yard market." ECF No. 79-1, at 25. He then attaches photographs of a number of other play yards

that he says are "examples of extensive adoption by others of the exposed tube concept." *Id.* at

25, 69–127. The rest of his testimony on the subject is contained in the following passage:

> There are in excess of 50 companies which have manufactured or sold products which are variants based on the patents which Wonderland deems to be infringements. A number of these offenders are currently being pursued in legal action for infringement. It is my view that these products are evidence of non-obviousness, because they incorporate the invention of the '919 patent, in that they are play yards, the uprights are undoubtedly tubular, the uprights support the fabric enclosure, and the uprights are substantially exposed.

*Id.* at 12.

But Drobinski has offered no foundation or support for this opinion, *see Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 609 (N.D. Cal. 2008) (excluding an expert's "conclusory opinion" that a feature was "copied" because such testimony "would not assist the jury 'to understand the evidence or to determine a fact in issue'" (quoting F.R.E. 702)), nor has he provided a sufficient link between his 58 pages of play yard photographs and the '919 patent. It is not enough merely to say that, because the play yards in his photographs have tubular uprights that support the fabric enclosure and are substantially exposed, those play yards are evidence of copying. To the contrary, as the Federal Circuit has explained, "copying requires evidence of efforts to replicate a specific product." *Wyers,* 616 F.3d at 1246. Mr. Drobinski's proposed testimony of his generalized assessments fails to provide any such evidence or the basis for such an opinion. Consequently, such testimony must be excluded under Federal Rule of Evidence 702.

### c. **Industry Praise**

"[A]n expert must establish a nexus between the industry praise and the patented technology." *Cot'n Wash, Inc. v. Henkel Corp.*, 56 F. Supp. 3d 626, 650 (D. Del. 2014) (holding that expert testimony about industry praise was inadmissible because the praise related to the

entire product in general—and not specifically the claimed invention—and there was therefore no nexus between the industry praise and the claimed invention) (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1351 (Fed. Cir. 2012)). The only "industry praise" offered by Mr. Drobinski for the claimed invention was a single statement allegedly made by an employee of Wonderland's client Graco. Drobinski learned of the statement only secondhand through a review of the Wonderland 30(b)(6) deposition. Apparently, the Graco employee reviewed a prototype that employed the technology of the '919 patent and said "ship it," which Drobinski takes to be obvious enthusiastic approval of the claimed invention in the product. Even if "ship it" could be so construed (which would be a stretch by any measure), Drobinski has still failed to establish a nexus between such "praise" and the actual '919 technology employed by the play yard—the statement just as easily may have applied to the play yard as a whole. His testimony regarding industry praise must be excluded.

### d. <u>Licensing</u>

Licenses "may constitute evidence of nonobviousness; however, only little weight can be attributed to such evidence if the patentee does not demonstrate a nexus between the merits of the invention and the licenses of record." *Iron Grip Barbell Co.*, 392 F.3d at 1324 (quoting *In re GPAC Inc.*, 57 F.3d at 1580). In this case, Mr. Drobinski's testimony has failed to establish such a nexus. First of all, he fails to offer evidence of any licenses of the actual '919 patent and instead relies on those relating to the European counterpart of the patent. It is unclear to the Court how a nexus exists between licenses of record and the merits of the patent in this action, the '919 patent, when the licenses do not even relate to the '919 patent. Second of all, as Thorley points out, the party that licensed the European counterpart of the '919 patent, one of Wonderland's competitors, Silver Cross (UK) Ltd., did so only after Wonderland accused it of

infringement.  *See Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1347 (Fed. Cir. 2013) (finding that licenses taken to avoid litigation risk lacked a nexus with the patented technology and did not support a finding of non-obviousness).  Mr. Drobinski's testimony on licensing is properly excluded.[7]

### 2.   **Thorley's Motion to Exclude the Expert Testimony of Mr. Michael Chase**

Thorley would also like to exclude Wonderland's damages expert, Michael Chase, from testifying about the damages allegedly resulting from Thorley's use of the Breeze, the allegedly infringing product.  ECF No. 66, at 6.  Thorley objects to Mr. Chase's damages testimony for three reasons, only one of which needs to be addressed here.  According to Thorley, Mr. Chase, in determining a reasonable royalty, failed to separate damages between the patented and unpatented features of the Breeze and, as a result, grossly overstated the value of the patented feature:

> [D]espite accepting Thorley's position that the fabric attachment feature has nothing to do with the overall innovation or market appeal of the Breeze, Mr. Chase nevertheless fails to separate or apportion the damages between the patented and unpatented features, and thus attributes far more value to the patented feature than is warranted by the circumstances.

ECF No. 66, at 16–17.  Thus, the entire market value rule ("EMVR") is implicated.  According to Thorley, there "has been an increased emphasis in recent years in ensuring that, where a patent covers but one feature of a multi-feature product, a reasonable royalty analysis 'does not overreach and encompass components not covered by the patent.'"  *Id.* at 17 (quoting *LaserDynamics, Inc. v. Quanta Computers, Inc.*, 694 F.3d 51, 70 (Fed. Cir. 2012)); *see also Versata Software, Inc. v. SAP Am., Inc.,* 717 F.3d 1255, 1268 (Fed. Cir. 2013) ("A patentee may assess damages based on the entire market value of the accused product only where the patented

---

[7] The rest of Mr. Drobinski's testimony, however, remains.  Thorley's Motion only seeks to exclude Mr. Drobinski's testimony regarding secondary considerations of nonobviousness. *See* ECF Nos. 63–64.

feature creates the basis for customer demand or substantially creates the value of the component parts."). Thorley claims that Mr. Chase's methodology ignores these clear instructions by attributing the entire market value of the Breeze to the minor patented feature. ECF No. 66, at 17. Furthermore, there is no evidence that the patented feature drives demand for the Breeze. Despite this, Mr. Chase ultimately concludes that Thorley should pay all of the cost impact to Wonderland as a royalty, something that would amount to overcompensation. *Id.* (citing *LaserDynamics*, 694 F.3d at 67 ("Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.").

Wonderland disagrees, arguing that Thorley misapprehends Mr. Chase's methodology. According to Wonderland, Mr. Chase's analysis does not implicate the EMVR:

> The EMVR is implicated when a royalty is calculated using a percentage rate applied to the entire selling price of an item. *LaserDynamics, Inc. v. Quanta Computers, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Unlike the damages expert in *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014), Chase is not using the value of the entire playard as a royalty bearing item. Rather, his analysis considers the cost to Thorley of implementing its hypothetical alternative and arrives at a lump sum royalty for an initial term and a fixed monthly amount thereafter. Chase does not use the full price of the breeze® as a royalty base, which is required before the entire market value is implicated.

ECF No. 106, at 17.

In approaching this issue, the Court looks to the guidance provided by the Federal Circuit in *LaserDynamics*:

> We reaffirm that in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature.

Regardless of the chosen royalty rate, one way in which the error of an improperly admitted entire market value rule theory manifests itself is in the disclosure of the revenues earned by the accused infringer associated with a complete product rather than the patented component only.

…

Admission of such overall revenues, which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is adequate to compensate for the infringement.

*LaserDynamics*, 694 F.3d at 67–68 (internal quotation marks omitted).

Despite Wonderland's attempt to re-characterize Mr. Chase's royalty analysis, the report itself demonstrates that he based his royalty calculations on the entire market value of the Breeze play yard without demonstrating that the product falls into the narrow class of exceptions (those products where the patented feature itself drives demand) permitting application of the EMVR. *See* ECF No. 81-1, at 25, 27. While it is true in this case that Mr. Chase did not discuss overall revenues for the Breeze product, his method nevertheless accounts for only the entire value of the Breeze (and not merely the value of the patented feature) in his damages calculations. Wonderland attempts to sidestep this issue by arguing that Mr. Chase was not required to perform an apportionment in this case since he based his damages opinion on an analysis of the cost impact rather than the sales price. But, as the Federal Circuit recently reaffirmed, "[n]o matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). In other words, it doesn't matter how Wonderland seeks to reframe the analysis performed by Mr. Chase: in the end, it still runs afoul of *LaserDynamics*. Mr. Chase considered only the value of the entire Breeze product in determining his suggested reasonable royalty, and his testimony must be excluded.

**B. Wonderland's Motion to Exclude the Testimony of Mark Gleason**

Wonderland seeks to exclude the testimony of Thorley's damages expert, Mark Gleason, on the basis that Gleason's damages opinions do no satisfy the requirements of Federal Rule of Evidence 702 and *Daubert*. ECF Nos. 67, 68, and 83. Gleason relied on information from Thorley employees—Henry Thorne, Thorley's CTO and cofounder, and Jared Rosenthal, the lead engineer on the Breeze project—who represented to Gleason that they had developed three alternative, non-infringing designs that could be developed fairly quickly and cheaply. ECF No. 83, at 10; *see also* ECF No. 82. The availability of these three design-around options, then, informed Gleason's expert report on damages (i.e., Gleason opined that Thorley would not be willing to pay a substantial amount in royalties when alternative, non-infringing designs were available to create and implement at relatively low cost). ECF No. 82, at 36–38.

The essence of Wonderland's objection boils down to the following: (1) Gleason assumed the design-arounds were available and acceptable but failed to disclose these precise alternatives to Wonderland, and (2) Thorley failed to submit any affidavits or expert reports to support the existence or design of its hypothetical non-infringing alternatives. ECF No. 68; ECF No. 120. Wonderland thinks that, in order for Gleason to rely on the opinion of the Thorley insiders (Thorne and Rosenthal) that design-arounds were available and acceptable (at the cost and time-frames contained in Gleason's expert report), Gleason would need to back these opinions up with "affidavits from Thorley's engineers relating to the alternatives and their respective technical feasibility, quotes from suppliers to verify the feasibility of the time periods to implement those alternatives, references to engineering drawings, or prototypes," and that "[a]bsent such factual support and any explanation of the methodology underlying the opinions

of non-infringement and availability, there is no basis for Mr. Gleason's expert opinion." ECF No. 120, at 5–6.

The Court disagrees with Wonderland's contention that Gleason is not permitted to rely on the opinions and representations of Thorne and Rosenthal. Federal Rule of Evidence 703 reads, in relevant part, as follows:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703. This scenario fits in that Rule. Wonderland is essentially asking this Court to graft multiple additional requirements onto Rule 703. Such requirements are not part of Rule 703, and the Court will not impose them here.[8] Wonderland's motion to exclude the testimony of Mark Gleason is therefore denied. If Wonderland believes that Mr. Gleason does not know what he is talking about, and a jury should not give his testimony the time of day, they may demonstrate that in the crucible of cross-examination at trial.

## V.   CONCLUSION

To sum up, the cross-motions for summary judgment are generally denied, except that Wonderland's is granted as to the "outer wall" limitation, which consequently no longer remains for trial; Wonderland's motion for summary judgment of no invalidity is denied, with the proviso that the Court rules as a matter of law that the Hammil patent does not anticipate the '919 patent; Thorley's motion to exclude portions of Jerry Drobinski's testimony is granted; Thorley's motion to exclude the testimony of Michael Chase is granted; and Wonderland's motion to exclude the testimony of Mark Gleason is denied.

---

[8] Furthermore, the Court would note that Thorley disclosed Gleason's expert report to Wonderland *before* Wonderland deposed him and Wonderland therefore had an opportunity to ask him questions about that portion of his expert report. *See* ECF No. 128, at 165–66, 172. Henry Thorne was also deposed, ECF No. 85-4, as was Jared Rosenthal, ECF No. 85-5.

An appropriate Order will issue.

                                        s/ Mark R. Hornak
                                        Mark R. Hornak
                                        United States District Judge

Dated: August 21, 2015

cc:     All counsel of record